# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| RONNELL L. GRIFFIE, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> CAROLYN W. COLVIN, Acting ) <br> Commissioner of the Social Security ) <br> Administration, ) <br> ) <br> Defendant. ) | Cause No. 1:13-cv-1407-WTL-DML |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Ronnell L. Griffie requests judicial review of the final decision of the Acting Commissioner of the Social Security Administration (the "Commissioner"), denying his application for Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"). The Court now rules as follows.

### I. PROCEDURAL HISTORY

Griffie filed his applications for DIB and SSI on November 29, 2010, alleging disability beginning March 1, 2009, due to chronic left hand and wrist pain, depression, anxiety, and post-traumatic stress disorder ("PTSD"). Griffie's application was initially denied on March 10, 2011, and again upon reconsideration on June 6, 2011. Thereafter, Griffie requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on March 21, 2012, via video conference before ALJ William M. Manico. Griffie and his counsel appeared in Indianapolis, Indiana, and the ALJ presided over the hearing from Falls Church, Virginia. During the hearing, Thomas A. Grzesik also testified as a vocational expert. On May 17, 2012, the ALJ issued a

decision denying Griffie's application for benefits. The Appeals Council upheld the ALJ's decision and denied a request for review on July 16, 2013. This action for judicial review ensued.

## II. EVIDENCE OF RECORD

Griffie's objections to the ALJ's decision relate only to his evaluation of Griffie's mental impairments. Thus, only those medical records are discussed.

On March 4, 2011, Michael O'Brien, Psy.D., examined Griffie at the request of the Disability Determination Bureau. According to Dr. O'Brien, "[w]hen asked why he was applying for disability, Mr. Griffie reported that his main concern was, 'my hand was severed to the tendons and I'm in pain.'" Tr. at 360. Dr. O'Brien also noted as follows:

> Mr. Griffie is currently unemployed and last worked as a warehouse worker at Crystal Clean. It was a full-time position that lasted two years, ended in March of 2009. Mr. Griffie reported that his employment ended because of being laid off indefinitely. He started receiving unemployment soon after and those continued until February of 2011. He reported that he got along with his co-workers and supervisors. . . .

*Id.* at 361. Regarding Griffie's complaints of depression, Dr. O'Brien reported that

> Mr. Griffie reported a history of depression. [But w]hen asked about depressive symptoms he said "I don't see myself, personally, as being depressed . . . my girlfriend says I am because I don't feel like doing nothing, but I don't pay much attention to that, most of what she says goes in one ear and out the other." . . .
>
> [Griffie also] denied any history of treatment for a mental health disorder, even when he was a child at the various residential facilities for orphans.[1] He is not on any medication for depression at this time. He denied any current problems with suicidal or homicidal ideation, intent, or plan.

*Id.* Dr. O'Brien ultimately diagnosed Griffie with no mental impairments.

---

[1] According to Griffie, he was one of twenty-two children, and he spent most of his childhood in foster care.

On February 9, 2011, Donna Unversaw, Ph.D., reviewed the medical evidence and completed a Psychiatric Review Technique. She opined that Griffie had "no defined psych[iatric] impairment," and that his "claim of dep[ression was] not supported." *Id.* at 358.

On April 19, 2011, a month and a half after Griffie met with Dr. O'Brien and five months after he applied for disability benefits, Griffie met with Julie McGuire, a nurse practitioner at the Jane Pauley Community Health Center, to discuss his "poor mood control." *Id.* at 380. Griffie was referred to McGuire by his primary care physician, Dr. John Fleming. McGuire made the following notes in her report:

> Depressed affect, anhedonia.[2] Not working, lost job, applying for disability. Difficulty with relationships. Has had much physical abuse as child, severe at times. Foster care much of childhood. Now has chronic depression, fights emerging memories of past events. No nightmares, but can't fall asleep. Edgy, nervous much of [the] time. Avoids people, crowds. . . . Has never spoken of the aforementioned events-just started speaking with PCP who referred client to me. Feels like [he] is "losing it." Anger growing, cares for 3 children, beginning to fear he won't be able to control his anger. . . .
>
> Using 3 beers daily . . . Smokes marijuana daily for calming.
>
> Takes Percocet which he buys off the street for pain control for his [left] hand. . . .

*Id.* at 380. McGuire diagnosed Griffie with PTSD and possible chronic major depression. She prescribed Cymbalta and recommended therapy with Maria Vail, a social worker at the same health center. On April 29, 2011, Dr. Fleming also noted that Griffie was "starting to be more open . . . , sharing details of his life." *Id.* at 382.

---

[2] Anhedonia is "a psychological condition characterized by [an] inability to experience pleasure in normally pleasurable acts." *Anhedonia*, MERRIAM-WEBSTER, *available at* http://www.merriam-webster.com/dictionary/anhedonia.

On June 17, 2011, McGuire noted that Griffie's "main concern [was] paranoia around people." *Id.* at 416. So much so, that he reportedly "counts people" and "feels fearful that some harm may befall him – irrationally." *Id.*

On July 29, 2011, after one of his therapy sessions, Vail reported as follows:

> [Griffie] had a rough week. States "I can't do crowds, I just can't do it." Pt got up very early and took oldest son to St. Vincent DePaul food pantry. Waited in line a couple of hours but then the crowd got so big patient had panic attack and had to leave before getting any food. Pt also was not able to keep appt to get some household items and furniture. He states "I know I need to do these things[, b]ut I can't deal with the crowd." Pt. very upset/frustrated that he is having such difficulty in public. He has been able to figure out the best times to catch the bus in order to avoid crowds. States he never realized how much work it is to be a parent when he was married because his wife took care of these kind of things. Pt. has to register kids for school next week. Still does not have any uniform clothing for them to wear. Pt still taking Cymbalta . . . and Percocet. Had another discussion about pt's hx of substance use. Pt very open and straightforward. States he feels very comfortable talking to me. He feels right now he has 2 options[, d]on't go in public . . . or buy something off the street. Pt states he will not buy off the street because he knows he shouldn't and he wants to be honest with Dr. Fleming and keep his pain contract. However, pt is left feeling hopeless and not sure what to do from here.

*Id.* at 406. After Vail discussed these issues with McGuire, McGuire wrote Griffie a prescription for Klonopin to treat his panic attacks.

On August 15, 2011, Vail reported that Griffie was doing "pretty good" and that his prescription for Klonopin was "very helpful." *Id.* at 404. It allowed him to run errands and "get things done." *Id.*

On August 17, 2011, Dr. Fleming completed a Physician Questionnaire regarding Griffie's impairments. Concerning Griffie's mental health, Dr. Fleming noted that he has "severe PTSD – flashbacks make[] it extremely difficult to go out in public, agoraphobia, panic attacks, often leaves building, hates to ride buses, can't stand in line, may not go to [appointment] or meeting if panic too bad." *Id.* at 388. Dr. Fleming admitted, however, that the nurse practitioner

4

(rather than he) was responsible for treating Griffie's mental health problems. Later that year, Dr. Fleming opined that Griffie's left hand issues coupled with his anxiety, depression, and PTSD, prevented him from obtaining gainful employment.

At some point, Vail and McGuire completed a Mental Residual Functional Capacity Assessment questionnaire. They opined that Griffie was markedly limited in the following:

- The ability to understand and remember detailed instructions;

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

- The ability to work in coordination with or proximity to others without being distracted by them;

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- The ability to respond appropriately to changes in the work setting; and

- The ability to travel in unfamiliar places or use public transportation.

They also opined that Griffie had moderate limitations in:

- The ability to carry out detailed instructions;

- The ability to maintain attention and concentration for extended periods;

- The ability to interact appropriately with the general public;

- The ability to accept instructions and respond appropriately to criticism from supervisors; and

- The ability to set realistic goals or make plans independently of others.

On December 21, 2011, Vail noted that Griffie complained of "more frequent panic attacks and anxiety in public," but that he was "still using klonopin to help manage symptoms so

that he can do the things he has to do." *Id.* at 464. She also noted that he "feels he will never be able to 'feel normal' due to his history of abuse." *Id.*

On January 4, 2012, McGuire reported that overall, Griffie's daily anxiety was much improved. His main concern was still social anxiety as it was hard being in public, shopping, and going to his kids' school. On February 3, 2012, McGuire again reported that Griffie had made substantial improvements in his mood and functioning. He still had daily anxiety and occasional panic attacks, but he was able to leave his home for appointments and meetings.

On March 21, 2012, Griffie testified at the hearing before ALJ Manico that he suffered from a panic attack every time he leaves his home. He also reported that he was not able to use public transportation, but used a Medicaid cab to attend appointments. Vail also testified that she would assess Griffie's GAF level to be somewhere between 45 and 50. She further opined that Griffie's would keep him from being gainfully employed.

### III. <u>APPLICABLE STANDARD</u>

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d) (1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is

not disabled, despite his medical condition and other factors. 20 C.F.R. § 404.1520(b).[3] At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 404.1520(g).

On review, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.,* and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue,* 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Id.*

---

[3]The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to DIB sections only.

## IV. THE ALJ'S DECISION

At step one, the ALJ found that Griffie had not engaged in substantial gainful activity since March 1, 2009, his alleged onset date. At step two, the ALJ concluded that Griffie suffered from the following severe impairments: chronic left (dominant) hand pain, depression, and anxiety. At step three, the ALJ determined that Griffie's severe impairments did not meet or medically equal a listed impairment. At step four, the ALJ concluded that Griffie had the residual functional capacity ("RFC") to perform

> light work . . . except lifting with the left upper extremity is limited to 10 pounds, and he may never climb ladders, ropes or scaffolds. [He also] retains the mental residual functional capacity to perform unskilled work with simple instructions where interactions with others are routine, superficial and incidental to the work performed. [He also] needs a regular work break approximately every two hours and should not do fast paced production work.

Tr. at 15. Given this RFC, the ALJ determined at step five that Griffie was capable of performing his past relevant work as a warehouse laborer/forklift operator. Accordingly, the ALJ concluded that Griffie was not disabled as defined by the Act from March 1, 2009, through the date of his decision.

## V. DISCUSSION

Griffie advances several objections to the ALJ's decision; each argument is addressed below.

### A. Failure to Call Psychologist

Griffie argues that the ALJ "acted as his own medical expert" and erred in failing to call a psychologist to testify regarding whether Griffie's "combined psychiatric impairments medically equaled any Listed impairment such as 12.06." Griffie's Br. at 17, 20. Specifically, Griffie takes issue with the fact that the "agency's review physicians . . . [reports] were dated 3-10-11 and 6-3-11[. T]hus [they] did not consider all of the evidence in the record," particularly the

psychotherapy notes from June 17, 2011, and the mental RFC assessments made by Vail and McGuire. *Id.* The Court agrees that additional review by a mental health professional is warranted.

Whether a claimant's condition equals a listed impairment is "strictly a medical determination," and "the focus must be on medical evidence." *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999). However, the court gives deference to an ALJ's decision about how much evidence is sufficient to develop the record and what measures are needed in to accomplish that goal. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2007); *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). Thus, an ALJ's decision to call a medical expert is discretionary, 20 C.F.R. § 416.927(f)(2)(iii), and an ALJ is not required to consult a medical expert if the medical evidence in the record is adequate to render a decision on the claimant's disability. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). With regard to updated medical opinions, an ALJ must consult a medical expert, "[w]hen additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p.

Although it is suspect that Griffie's anxiety, depression, and PTSD were not noted until after he applied for benefits and met with Dr. O'Brien, the symptoms reported to Vail and McGuire appear relatively disabling and credible enough to warrant medical review – especially since these were new complaints that had not been considered by the previous reviewing doctor. The Court finds that ALJ should have consulted a mental health professional regarding the additional medical evidence prior to issuing his decision. On remand, the ALJ is specifically

instructed to consult a mental health professional and revise his decision to the extent it is affected by the updated opinion.

## B. Listing 12.06

Griffie also argues that "his combined mental impairments met or, medically equaled Listing 12.06." Griffie's Br. at 15. Listing 12.06 states, in pertinent part, as follows:

> The required level of severity for [anxiety-related] disorders is met when the requirements in both A and B are satisfied . . .
>
> A. Medically documented findings of at least one of the following:
>
> 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
>
>    a. Motor tension; or
>    b. Autonomic hyperactivity; or
>    c. Apprehensive expectation; or
>    d. Vigilance and scanning; or
>
> 2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
>
> 3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
>
> 4. Recurrent obsessions or compulsions which are a source of marked distress; or
>
> 5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
>
> B. Resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

Griffie takes issue with the ALJ's analysis as it relates to paragraph B. He argues that "[t]he ALJ's 12.06B determination [was] directly contrary to the mental residual functional capacity evaluation [prepared by Vail and McGuire] which determined that he had Marked impairment in concentration, persistence or pace and in social functioning and [Vail's opinion] that he had a GAF assessment of 45 to 50 proving by definition that he was totally disabled." Griffie's Reply at 3-4.

First, Griffie's assertion that his GAF score "proves by definition" that he is totally disabled is mistaken. "[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citations and quotations omitted). Moreover, the Social Security Administration has concluded that GAF scores do "not have a direct correlation to the severity requirements in [the] mental disorders listings." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 F.R. 50746-01.

Next, with regard to the 12.06B criteria, Griffie points to the assessment completed by Vail and McGuire, to establish that he has marked difficulties in maintaining social functioning and concentration, persistence, or pace. First, it is important to note that Vail and McGuire did not find, per se, that Griffie met the requirements of Listing 12.06B. They opined that Griffie had marked limitation in "the ability to get along with coworkers or peers without distracting them or exhibiting behavior extremes," "the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," "the ability to work in coordination with or proximity to others without being distracted by them," and "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

11

periods." Tr. at 449-50. While these issues certainly relate to the paragraph B criteria, they are only *aspects* of those criteria.

With that said, this matter is being remanded so that the ALJ may obtain an updated opinion from a mental health professional. The ALJ shall also update his analysis of Listing 12.06 to the extent it is affected by the mental health professional's opinion.

### C. Credibility Determination

Griffie also argues that the ALJ's credibility determination was "patently erroneous" because it was "contrary to the evidence and contrary to Social Security Ruling 96-7p." Griffie's Br. at 23. More specifically, Griffie argues that the ALJ's credibility determination

> was contrary to the evidence because the ALJ arbitrarily and erroneously rejected the psychiatric and psychological evaluations . . . which proved the claimant's combined impairments met or equaled Listing 12.06 and thus fully corroborated the claimant's allegations of total disability.

Griffie's Br. at 23. In other words, Griffie argues that the ALJ erroneously rejected the opinions of Vail and McGuire.

Regarding the psychological assessment completed by Vail and McGuire, the ALJ noted as follows:

> The record indicates Ms. Vail met with the claimant for about 45 minutes once per month and she testified her role was to help the claimant apply for public assistance, as well as provide counseling. She testified that she based her opinion on the claimant's subjective complaints, but that she also observed that he appeared nervous at times, and he would leave the waiting room to wait outside, and that he told her it was because he had difficulty being around others.

Tr. at 23. It appears the ALJ discounted the assessment mostly because it was based on Griffie's subjective complaints – which the ALJ also determined to be less than credible, based on the medical evidence of record. The medical evidence of record, however, will be altered on remand.

12

Thus, on remand, the ALJ should also reevaluate his credibility determination in light of the updated medical opinion.[4]

### D. Step Four Determination/RFC Assessment

Lastly, Griffie argues that "the ALJ's residual functional capacity assessment did not accurately describe the claimant's impairments." Griffie's Br. at 27. In particular, Griffie argues as follows:

> The ALJ impermissibly failed to account for the claimant's anxiety and post trauma stress disorder with frequent panic attacks and flashbacks, agoraphobia and Marked impairment in concentration, persistence or pace and in social functioning with GAF assessment from 45 to 50, and the ALJ's assessed Moderate impairment in social functioning and in concentration persistence or pace.

Griffie's Br. at 27. On remand, the ALJ's RFC analysis and/or his determination at step four may be affected by the updated medical opinion. Accordingly, to the extent they are affected, the ALJ must also reevaluate his RFC analysis and his determination at step four.

### VI. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this Entry.

SO ORDERED: 9/11/14

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[4] As a side note, Griffie also faults the ALJ for using irrational boilerplate language to explain his credibility determination. As noted by this Court on several occasions, although the Court shares in the sentiments expressed by the Seventh Circuit regarding the meaninglessness of certain Social Security "templates," similar to the one used here, it is not dispositive in this case. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012). Griffie further argues that the ALJ's credibility determination was "conclusory" and "vague." Griffie's Br. at 26. Griffie, however, does not identify the alleged conclusory statements or describe why the ALJ's determination was vague.